**Affirmed as Modified; Opinion Filed December 11, 2024**



In The
# Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-23-00077-CV

**JADY WINGS, Appellant**
**V.**
**STEVEN J. FREEDMAN AND FREEDMAN METALS, INC. D/B/A FMI RECYCLING, Appellees**

**On Appeal from the 44th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DC-21-01163**

## MEMORANDUM OPINION

Before Justices Nowell, Miskel, and Kennedy
Opinion by Justice Miskel

Jady Wings ("Wings") and Steven Freedman ("Freedman") were members of a Texas limited liability company. They could not agree on major decisions involving the company. Accordingly, Wings invoked a buy-sell provision in the company agreement. However, the parties could not agree on the workings of this provision, and they resorted to litigation to resolve their dispute. They each filed motions for partial summary judgment asking the trial court to find that the other party breached the company agreement and to order the other to sell his interest in the company for the prices set forth in their respective notice letters. The trial court

granted Freedman's motion and denied Wing's motion, but the court ordered Freedman to pay Wings's price. The trial court also awarded attorney's fees to Freedman and rendered judgment incorporating its summary-judgment orders. Both Wings and Freedman have appealed the judgment.[1]

To resolve this cross appeal, we must construe the terms of the company agreement and determine whether the trial court erred by (i) requiring Wings to sell his interest in the company to Freedman, (ii) requiring Freedman to pay a sale price that he claims was contrary to the agreement's terms, and (iii) awarding attorney's fees to Freedman. For the reasons discussed below, we modify the judgment and affirm it as modified.

## I.     Background and Procedural Facts

Wings and Freedman formed Freewings Realty, LLC ("Freewings" or the "Company"), a Texas limited liability company, to serve as a vehicle through which they could jointly purchase a parcel of real property (the "Property"). Freedman's business, appellee Freedman Metals Inc. d/b/a "FMI," was a tenant of the Property throughout the period at issue in this case. Wings's business, GEM Southwest, LLC, was also a tenant of the Property for part of the relevant period.

---

[1] Freedman Metals Inc. d/b/a "FMI" is also a party in this appeal, but the issues raised in the parties' briefs pertain solely to the trial court's rulings that relate to Wings and Freedman.

**A.** **The Parties Entered into a Company Agreement that Contained a Buy-Sell Option.**

To accomplish the formation of Freewings, Wings and Freedman entered into a Company Agreement. They subsequently signed an Amended and Restated Company Agreement (the "Agreement"), which is the contract at issue in this case. Under the Agreement, Wings contributed 77% of the capital and received a 65% ownership interest (a "Membership Interest"), and Freedman contributed 23% of the capital and received the remaining 35% Membership Interest.

The parties agreed to a "Buy-Sell" provision in the Agreement, § 12.2, which either party could invoke if the parties disagreed on a "Major Decision." Specifically, § 12.2 provides, in pertinent part:

> If the Managers or Members cannot agree on a Major Decision, then either Member, provided such Member is not in default under the terms hereof (the "Offeror"), may offer to buy all but not less than all of the Membership Interest of any other Member (the "Offeree") by delivering a written notice containing the per Membership unit or percentage of ownership offer price (for example, any offer should be based on 100% ownership so that the unequal Membership Interest is taken into account with such offer) and all essential terms of such offer (the "Offer") to the Offeree; provided, however, that the Offeror shall allow at least thirty (30) days from its delivery before the Offeree has to perform the first act (other than acceptance of the Offer) or pay the first amount due under the Offer. The Offeree shall have the option to either (i) sell his Membership Interest to the Offeror, pursuant to the terms of the Offer, or (ii) buy the Offeror's Membership Interest, pursuant to the terms of the Offer. Notice of the Offeree's election to buy or sell shall be given to the Offeror within twenty (20) days of receipt of the Offer. The failure of the Offeree to give notice of his

–3–

election within such twenty (20) day period shall be deemed an acceptance by the Offeree to sell his Membership Interest to the Offeror. (underlining added).[2]

## B.    Wings Invoked the Buy-Sell Option and Made an Offer to Freedman.

The parties disagreed regarding Major Decisions involving the Company. On December 8, 2020, Wings invoked § 12.2 and notified Freedman that Wings would "purchase all of [Freedman's] Membership Interest in the Company" on terms that included the following:

> Upon the execution of the final sale documents by the parties, SJF will be paid the lump sum of $658,485.16 for all of SJF's Membership Interest in the Company, which includes the return of all monies in SJF's capital account, which has a current balance of $156,751.49 (the "**Purchase Price**"). The offer is based on a $4 million fair market valuation of the Company and the valuation of the Membership Interests of Wings and SJF have been calculated as reflected on Exhibit A to this letter.

Exhibit A described a detailed "Valuation of Membership Interests," under which Wings proposed a method by which he calculated different "buy" and "sell"

---

[2] Provisions such as § 12.2 are commonly referred to as "Texas Shootout" provisions. Such terms have been described as follows:

> When two parties enter a joint venture, they recognize that, at some point, one or the other will want to terminate the arrangement. When neither faces any liquidity constraints and both are equally able to run the business, they may agree at the outset that as soon as one of them wants to terminate the venture, she can put a value on the business and the other has the choice to buy or sell the business at this price. This way of dissolving a joint venture is called a "Texas Shootout."

Douglas G. Baird and Donald S. Bernstein, *Absolute Priority, Valuation Uncertainty, and the Reorganization Bargain*, 115 YALE LAW JOURNAL 1930, 1953 (2006). These provisions are similar to the familiar "I cut, you choose" method of dividing desserts, for example. *See* https://en.wikipedia.org/wiki/Divide_and_choose (last accessed 10/31/2024).

prices.[3]  Pursuant to his own calculations, Wings arrived at the following offer prices:  Wings would pay $658,485.16 to purchase Freedman's 35% Membership Interest or Freedman could pay $1,470,752.62 to purchase Wings's 65% Membership Interest.  Effectively, Wings offered to pay Freedman $18,813.86 for each Membership unit of Freedman's ownership, while contending that Freedman must pay Wings $22,626.96 for each Membership unit of Wings's ownership.

## C.    Freedman Elected to Buy Out Wings.

Under § 12.2, Freedman had twenty days (until December 28, 2020) to respond to Wings's offer.  On December 17, Freedman requested a two-day extension to respond to the offer (until December 30), and Wings agreed to Freedman's request.  On December 30, 2020, Freedman sent an e-mail to Wings in which Freedman stated that he was electing to buy Wings's Membership Interest "pursuant to the terms of the Offer and § 12.2(ii) of the Agreement."

Based on Wings's December 8 offer to buy Freedman's 35% Membership Interest for a Purchase Price of $658,485.16, Freedman calculated "the per

---

[3] Wings estimated the Company's fair market value at $4 million.  He subtracted commissions, title insurance, closing costs, loan payoffs, and the return of capital, which yielded net proceeds of $2,129,237.78.  Wings then allocated the return of capital (which totaled $695,713) to each Member according to his percentage of capital contributions, subject to certain reductions in original capital contributed as the result of an insurance settlement.  Wings allocated approximately 77% of the Company's capital to himself ($538,961.51), and he allocated approximately 23% of the Company's capital to Freedman ($156,751.49).  Next, Wings allocated the balance of the Company's fair market value, net of all the above items, to each Member according to his percentage of ownership in the Company.  Wings allocated 65% of such balance to himself ($931,791.11) and he allocated 35% of such balance ($501,733.67) to Freedman.  Finally, Wings added each Member's share of the Company's unreturned capital contributions to his share of the Company's net fair market value.

Membership unit of ownership price" to be $18,813.86 ($658,485.16 divided by 35). Upon applying this "per Membership unit" price to Wings's 65% Membership Interest, Freedman calculated the Purchase Price for Wings's Membership Interest to be $1,222,901.01 ($18,813.86 multiplied by 65). Freedman agreed to pay $1,222,901.01 to Wings upon the parties' execution of the final sale documents. (Freedman's number differed from Wings's proposed $1,470,752.62 price because Wings contended he should be repaid his share of the capital contributions in addition to his ownership interest.)

**D.     Wings Disputed the Validity of Freedman's Election.**

In response to Freedman's December 30 notice, Wings sent a letter to Freedman which disputed Freedman's attempt "to impose [his] calculations as a basis for the sales price that [Wings was] required to accept." Wings disagreed with Freedman's "proposed valuation of [Wings's] interests." In Wings's view, "such a procedure is not provided for in the Agreement." Wings also rejected Freedman's December 30 e-mail to the extent it was "intended as some kind of independent offer" to purchase Wings's interest in the Company for $1,222,901.01.

**E.     The Parties Filed Suit.**

Wings filed suit against Freedman and FMI. Among other claims, Wings asserted claims against Freedman for breach of the Agreement and sought a declaratory judgment related to the Agreement. In addition, Wings sought attorney's

fees from Freedman related to these claims.[4]  Freedman responded by asserting the same as counterclaims against Wings.  Wings and Freedman also filed competing traditional motions for partial summary judgment on their respective claims and counterclaims.[5]  Pertinent to this appeal, Wings sought relief requiring Freedman to sell his interest to Wings at the $658,485.16 price stated in Wings's December 8 offer.  In contrast, Freedman sought relief requiring Wings to sell his interest to Freedman at the $1,222,901.01 price stated in Freedman's December 30 response to Wings's offer.  Freedman also sought alternative relief that Wings "is required to sell his 65% membership interest in Freewings to Freedman for $1,470,752.62"—the figure set forth in Wings's December 8 offer.

The trial court granted Freedman's motions for partial summary judgment and denied Wings's motion.[6]  The court concluded that Wings had breached the

---

[4] Wings also asserted claims against FMI for breach of a loan agreement, and he sought attorney's fees from FMI related to this claim.  This claim was later resolved, and Wings nonsuited it.

[5] Wings's motion sought partial summary judgment on both his breach of contract and declaratory judgment claims.  In contrast, Freedman filed two separate motions, one of that sought partial summary judgment on his breach-of-contract counterclaim, and the other that sought partial summary judgment on his declaratory judgment counterclaim. Wings and Freedman also submitted evidence in support of and in opposition to the competing summary-judgment motions.  Such evidence consisted of the Agreement, relevant correspondence exchanged between Wings and Freedman, and declarations submitted by Wings and Freedman regarding the events at issue this case.

[6] On December 17, 2021, the trial court signed an order granting Freedman's motion for partial summary judgment on his breach-of-contract counterclaim and a separate order granting Freedman's motion for partial summary judgment on his declaratory judgment counterclaim.  Wings filed a motion to clarify, and a request to reconsider, these orders.  On May 10, 2022, the trial judge signed amended orders granting Freedman's motions for partial summary judgment.  Neither the trial court's December 17 order nor its May 10 order expressly denied Wings's motion for partial summary judgment, but the parties do not dispute that, by granting Freedman's motions, the trial court also denied Wings's motions.

Agreement but ordered Wings to sell his 65% Membership Interest to Freedman for the "Purchase Price" of $1,470,752.62 that Wings had initially proposed.

Thereafter, the parties stipulated to the amount of Freedman's attorney's fees at the trial court level, subject to Wings's right to challenge whether Freedman is entitled to such fees. On October 25, 2022, the trial court signed a final judgment that incorporated its prior summary judgment orders and awarded fees pursuant to the above stipulation. Wings filed timely plenary-extending motions and a notice of appeal on November 23, 2022, and on January 20, 2023, respectively. The parties then agreed to a second stipulation regarding Freedman's attorney's fees. On February 7, 2023, the trial signed an amended final judgment that awarded Freedman additional attorney's fees pursuant to the second stipulation. Freedman and FMI filed a notice of cross-appeal the next day, on February 8.[7]

On March 3, 2023, Wings filed a timely motion to modify, correct, or reform the amended final judgment, which again extended the court's plenary power. On April 18, 2023, the trial court signed a second amended final judgment which added language not at issue in this appeal. The second amended final judgment is the operative judgment in this case.

---

[7] As noted previously, the issues raised in the parties' briefs pertain solely to the trial court's rulings that relate to Wings and Freedman.

## II. Standard of Review

To prevail on a traditional motion for summary judgment, the movant must show there is no genuine issue of material fact and that, as a result, it is entitled to judgment as a matter of law. *See* TEX. R. CIV. P. 166a(c). When both parties move for summary judgment and the trial court grants one motion and denies the other, we must we determine all issues presented and render the judgment the trial court should have rendered. *Colorado Cty. v. Staff*, 510 S.W.3d 435, 444 (Tex. 2017). Each party bears the burden to establish that it is entitled to judgment as a matter of law. *Yowell v. Granite Operating Co,*, 620 S.W.3d 335, 343 (Tex. 2020).

## III. Applicable Law

Wings and Freedman agree that the material facts surrounding this case are undisputed. Also, we agree with their contention that § 12.2 (the "Buy-Sell" provision) of the Agreement is not ambiguous. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (explaining that contract may be ambiguous even though parties agree it is not). The interpretation of an unambiguous contract is a question of law that we review de novo using well-settled contract-construction principles. *Id*.

When a contract's meaning is disputed, we must ascertain and give effect to the parties' intent as expressed in the instrument. *Id*. "Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not." *Id.* at 763–64 (internal citation and quotation marks omitted). Accordingly,

–9–

we "presume parties intend what the words of their contract say and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise." *Id.* at 764 (internal citations and quotation marks omitted); *see also Mosaic Baybrook One, L.P. v. Simien*, 674 S.W.3d 234, 257 (Tex. 2023) ("[W]e will give a contract language its plain, grammatical meaning unless it would clearly defeat the parties' intentions." (internal citation and quotation marks omitted)).

## IV.     Freedman was Entitled to Buy at Freedman's Price.

Wings's appeal raises two issues.  His first issue contends that the trial court erred in granting Freedman's motions for partial summary judgment and in denying Wings's motion when:

1.      Wings's offer complied with the requirements of § 12.2;

2.      Freedman's response did not comply with the requirements of § 12.2 because Freedman did not elect to either buy Wings's interest in the company or sell Freedman's interest in the company pursuant to the terms of Wings's offer;

3.      Freedman's failure to make a proper election constitutes a "deemed acceptance" to sell his interest to Wings at Wings's offer price, entitling Wings to judgment requiring Freedman to sell his interest at that price; and

4.      Freedman's response was a counteroffer that constitutes a rejection and terminated his ability to later accept Wings's offer, preventing the trial court from ordering Wings to sell his interest to Freedman at the offer price Freedman had rejected.

Freedman's cross appeal raises three cross issues:

1.  Section 12.2 of the Agreement did not permit Wings to dictate a different, higher per-unit price for his own interest than he offered to pay for Freedman's interest.

2.  Freedman complied with § 12.2(ii) by opting to buy Wings's 65% Membership Interest for an amount calculated exclusively "pursuant to" Wings's Offer to buy Freedman's 35% interest for $658,485.16.

3.  The trial court erred by ordering Freedman to pay the sale price calculated by Wings's formulas, rather than the per-unit price calculated from Wings's Offer to buy Freedman's 35% interest for $658,485.16.

In their briefs, Wings and Freedman have consolidated the above issues into three questions:

1.  Did Wings's December 8 offer comply with § 12.2?

2.  Did Freedman's December 30 response to Wings's offer comply with § 12.2?

3.  What is the legal effect of Freedman's response?

We will use this framework in our analysis below resolving the parties' issues raised on appeal and cross appeal.

## A.  Question 1 - Wings's December 8 Offer Complied in part with § 12.2.

Wings offered to buy Freedman's Membership Interest for $658,485.16, based on a "percentage of ownership offer price." Exhibit A also offered to sell Wings's Membership Interest to Freedman for $1,470,752.62. Effectively, Wings proposed to set a price for Freedman's interest at $18,813.86 for each percentage of ownership, while setting a price for Wings's interest at $22,626.96 for each

–11–

percentage of ownership. Wings based these offer prices on his assertion that each Member should first be repaid his capital contributions (based on a "77/23" split), and then be paid his share of the net fair market value of the Company (based on a "65/35" split).

The parties do not dispute that Wings's offer to buy Freedman's Membership Interest for $658,485.16 was a valid offer under § 12.2. However, they disagree whether Wings's offer to sell his Membership Interest for $1,470,752.62, and his inclusion of the parties' unreturned capital contributions in his proposed valuation method, are "terms of the Offer" under § 12.2.

Wings argues that his offer to sell his Membership Interest for $1,470,752.62 was a "term of the Offer" under § 12.2 because it was "based on 100% ownership" and reflected a "percentage of ownership offer price" based on Wings's claim to a share of unreturned capital contributions in addition to his ownership interest in the Company. In contrast, Freedman contends that the "terms of the Offer" under § 12.2 did not include Wings's $1,470,752.62 offer price to sell his own Membership Interest, nor did they include the valuation method that Wings proposed to calculate this offer price. As discussed below, we agree with Freedman.

1. **Wings could not dictate a different, higher price for the sale of his Membership Interest to Freedman.**

Section 12.2 provides that an offeror may "offer to buy" by delivering a notice with "*the* per Membership unit or percentage of ownership *offer price* . . . and all essential terms of *such* offer" (emphasis added). Section 12.2 authorizes only one

offer—an "offer to buy" at one singular "offer price." Such "offer price" must be described as a "per Membership unit or percentage of ownership offer price." Section 12.2 does not permit the Offeror to also include a second offer to sell his own Membership at a different price. Instead, should an Offeree elect to buy the Offeror's Membership Interest, § 12.2 requires that such purchase shall be made "pursuant to the terms of the Offer," i.e., pursuant to the terms of the Offeror's "offer to buy." Under the contract, the offeror proposes one price, and the offeree may elect to either buy or sell at that same price.

Wings's offer complied with § 12.2 insofar as it included "an offer to buy" Freedman's Membership Interest for a "percentage of ownership offer price" of $658,485.16. However, § 12.2 did not permit Wings to also bind Freedman to a different $1,470,752.62 sale price for Wings's Membership Interest. Instead, upon Freedman's election to buy Wings's Membership Interest, the sale price was determined based upon the terms of Wings's offer price to buy Freedman's Membership Interest. By making the offer of $658,485.16 for 35%, Wings offered to buy or sell at that price.

**2.    Wings could not make his proposed valuation method a "term of such offer."**

Section 12.2 does not provide any method for valuing Membership Interests— it contains an ad hoc method for one owner to buy out another at a fair price without formalities. Accordingly, Wings was free to use his proposed valuation method, or no valuation method at all, when determining "*the* per Membership unit or

percentage of ownership offer price" (emphasis added) to buy Freedman's Membership Interest. However, the language of § 12.2 references only an "offer to buy." While § 12.2 specifies that an offeror may deliver a notice with "all essential terms of such offer," the "*such* offer" refers back to "*the*" singular "offer price" (emphasis added). This language did not authorize Wings, as an "essential term," to add a second offer price for Freedman to purchase Wings's Membership Interest, based on a valuation method to which Freedman never agreed.

Wings's valuation method resulted in prices that favored Wings, and disfavored Freedman, as compared to what these offer prices would have been had Wings considered only the percentage ownership interests in the Company. Wings's consideration of unreturned capital contributions is contrary to the meaning of the term "Membership Interest." Per § 4.1 of the Agreement, a "[e]ach Member shall have and own an interest (hereinafter referred to individually as a 'Membership Interest' or collectively as 'Membership Interests'), *in the Company*, which shall be expressed in terms of a percentage of the whole." (Emphasis added). According to § 12.2, "any offer should be based upon 100% ownership so that the unequal *Membership Interest* is taken into account with such offer." (Emphasis added). Reading these two provisions together, § 12.2 refers to the proportion of each Member's ownership of the Company, not the proportion of each Members' capital contributions.

In sum, although Wings could use any valuation method (or no method) in arriving at "*the*" "*offer price*" to buy Freedman's Membership Interest, such offer price itself, and not the *method* that Wings used to value the parties' Membership Interests, was the "term of the offer" under § 12.2 that determined the price applicable to Freedman's election to buy Wings's Membership Interest.

### 3. The Agreement's other sections do not support Wings's argument.

Wings points to other sections of the Agreement that, in other contexts, refer to the distribution of capital contributions and to a method for valuing a Member's Membership Interest. However, these sections are not relevant to our analysis of the buy-sell provision in § 12.2, which contains no such language.

Section 8.1 of the Agreement applies to the Company's "Distribution of Net Cash Flow," which pertains to distributions by the Company to its Members. The section provides that cash proceeds realized from operations will be proportionately distributed, among other priorities, to repay capital contributions. However, § 8.1 does not apply to one Member's purchase of the other Member's Membership Interest. Although the Members could have included language in § 12.2 that required an order of priority payments, such as in § 8.1, they did not do so. *Cf. URI*, 543 S.W.3d at 763–64 ("Objective manifestations of intent control, not what one side or the other alleges they intended to say but did not." (internal citation and quotation marks omitted)). Accordingly, § 8.1 has no bearing on our analysis of § 12.2.

Section 12.1, titled "Purchase Option," may apply if a "Subject Member" experiences divorce, death, legally declared incompetency, permanent disability, bankruptcy, insolvency, dissolution, or default of his obligations. If the members cannot agree upon the fair market value of the Subject Member's Membership Interest, then § 12.1 provides for the appointment of appraisers who will determine the fair market value of the Subject Member's Membership Interest, "taking into consideration the Subject Member's capital account balance, priority of distributions afforded the Subject Member, the fair market value of the Property, any outstanding indebtedness, liabilities, liens, obligations relating [to] the Company and the Company's assets, and all other relevant factors in determining fair market value, except the appraiser will not consider any majority or minority control issues." No one has argued that the life events triggering § 12.1 apply in this case—Wings's original offer expressly invoked § 12.2. Again, although the Members could have included language in § 12.2 that prescribed a formal valuation method for the "per Membership unit or percentage of ownership offer price," they did not do so. Therefore, § 12.1 has no bearing on our analysis of § 12.2.

### 4. Question 1 Conclusion

The portion of Wings's December 8 offer to buy Freedman's Membership Interest for $658,485.16 ($18,813.86 for each Membership unit) complied with § 12.2. The additional explanations and proposals in Wings's December 8 offer,

such as his valuation method and his $22,626.96 sale price for each Membership unit of his own ownership interest, are not binding terms under § 12.2.

**B.    Question 2 - Freedman's December 30 Election Complied with § 12.2.**

Wings contends that, pursuant to his own offer, Freedman could only elect to sell his Membership Interest to Wings for $658,485.16 ($18,813.86 for each Membership unit) or buy Wings's Membership Interest for $1,470,752.62 ($22,626.96 for each Membership unit). Wings argues that Freedman failed to comply with § 12.2 because Freedman elected neither option.

Instead, Freedman offered to buy Wings's interest for $1,222,901.01 ($18,813.86 for each Membership unit). Wings cites case law which holds that, to exercise an option, "strict compliance with the provisions of an option contract is required." *Vertical Holdings, LLC v. LocatorX, Inc.*, No. 05-22-00720-CV, 2023 WL 5949023, at *5 (Tex. App.—Dallas Sept. 13, 2023, pet. denied) (mem. op.) (internal citation and quotation marks omitted). "Acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the contract." *Id.* (internal citation and quotation marks omitted). "Any failure to exercise an option according to its terms, including untimely or defective acceptance, is simply ineffectual, and legally amounts to nothing more than a rejection." *Levu GP, LLC v. Pacifico Partners LTD*, No. 05-16-01167-CV, 2018 WL 4039638, at *4 (Tex. App.—Dallas Aug. 23, 2018, pet. denied) (mem. op.) (internal citation and quotation marks omitted)).

–17–

Wings also asserts that Freedman's election to buy Wings's Membership Interest for $1,222,901.01 did not strictly comply with "the terms of the Offer" because it was based on a "per Membership unit" offer price rather than on Wings's "percentage of ownership offer" price and it employed a calculation that "ignored the discrepancy" between Wings's capital contributions and Freedman's.

As discussed below, we disagree with Wings's contention that Freedman did not strictly comply with "the terms of the Offer."

### 1. Freedman's election was "pursuant to the terms" of Wings's Offer.

Freedman's December 30 election calculated the $1,222,901.01 price to purchase Wings's Membership Interest based on Wings's offer and "the" "per Membership unit" offer price referenced in § 12.2.

Specifically, Freedman assumed the existence of 100 membership units for the whole of the company, 35 of which were owned by Freedman in proportion to his 35% interest. Freedman divided the above $658,485.16 purchase price by 35 to yield a "per Membership unit of ownership price" equal to $18,813.86. Freedman then multiplied this number by 65 (the number of units proportionate to Wings 65% interest) to yield a purchase price of $1,222,901.01.

Freedman's summary-judgment declaration, and his briefing in this appeal, explain that the above $1,222,901.01 purchase price can also be determining by applying the "percentage of ownership price" referenced in § 12.2. To illustrate, Freedman divided $658,485.16 by 35% (i.e., by 0.35) to ascertain the price for a

100% ownership stake in the Company. Upon applying this formula to Wings's Offer of $658,485.16, Freedman arrived at a price of $1,881,386.17 for a 100% ownership stake in the Company. Freedman then multiplied this sum by Wings's 65% of ownership (i.e., by 0.65) to arrive at a purchase price of $1,222,901.01.

In short, "the terms of the offer"—i.e., Wings's offer to buy Freedman's Membership Interest for $658,485.16—yield a $1,222,901.01 price for Freedman to buy Wings's Membership Interest, regardless of whether a "per Membership unit" price or a "percentage of ownership" price is used. Accordingly, the above $1,222,901.01 price to buy Wing's Membership Interest was "pursuant to the terms of the Offer" because such price was merely the converse of Wings's $658,485.16 offer price to buy Freedman's Membership Interest.

### 2. Freedman is not deemed to have accepted Wings's offer.

Because Wings contends that Freedman failed to make a proper election under § 12.2, Wings urges that Freedman is therefore "deemed" to have accepted Wings's offer to buy Freedman's Membership Interest for $658,485.16. Wings bases this argument on language in § 12.2 which provides that "[t]he failure of the Offeree to give notice of his election within [a] twenty (20) day period shall be deemed an acceptance by the Offeree to sell his Membership Interest to the Offeror." In Wings's view, Freedman's alleged failure to make a proper election within this deadline amounted to a failure to give notice and therefore an acceptance of Wings's offer. Accordingly, Wings contends that the trial court should have ordered

Freedman to sell his Membership Interest to Wings at the $658,485.16 offer price set forth in Wings's offer.

As explained previously, Freedman's election to buy Wings's Membership Interest for $1,222,901.01 was proper under § 12.2. Therefore, Freedman is not' "deemed" to have accepted Wings's offer to buy Freedman's Membership Interest.

### 3. Freedman's election to buy Wings's Membership Interest for $1,222,901.01 was not a counteroffer.

Wings also contends that Freedman's election to buy Wings's Membership Interest at a price different than the price contained in Wings's offer was a counteroffer. *Davis v. Texas Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [14th Dist.] 2015, no pet.) ("A counteroffer is an offer made by an offeree to her offeror relating to the same matter as the original offer and proposing a substituted bargain differing from that proposed by the original offer."). In Wings's view, Freedman's purported counteroffer amounted to a rejection of Wings's offer to sell his Membership Interest to Freedman. *See id.* at 104–05 (noting that a counteroffer constitutes a rejection, not an acceptance, of the original offer).

Under Texas law, "an attempted acceptance, which modifies the terms of an offer, is not an acceptance, but is, in effect, a rejection, and an offer in lieu of the one rejected, which, to constitute a contract, must be accepted by the other party." *Liquids Dispatch Line v. Texas Power & Light Co.*, 6 S.W.2d 169, 170 (Tex. App.—Dallas 1928, writ ref'd). However, "an immaterial variation between the offer and acceptance will not prevent the formation of an enforceable agreement." *Amedisys,*

–20–

*Inc. v. Kingwood Home Health Care, LLC*, 437 S.W.3d 507, 514 (Tex. 2014). The materiality of a contract term is determined on a contract-by-contract basis, in the light of the contract's circumstances. *Id.* A contract provision dealing with payment is always a material term. *Bismar v. Mitchell*, No. 05-21-00104-CV, 2023 WL 545512, at *5 (Tex. App.—Dallas Jan. 27, 2023, no pet.) (mem. op).

The language of § 12.2, however, explicitly ties the price of an Offeree's purchase of the Offeror's Membership Interest to the Offeror's "per Membership unit or percentage of ownership offer price" contained in the Offeror's "offer to buy" the Offeree's Membership Interest. Accordingly, Wings's offer to *sell* his 65% Membership Interest for a higher per-unit price was not a "term of the Offer," much less a material term, under § 12.2. Therefore, Freedman's election to buy Wings's 65% Membership Interest for the price calculated solely from the terms of Wings's "offer to buy" Freedman's 35% Membership Interest did not vary a "term of the offer" under § 12.2. Thus, the price contained in Freedman's election was not a counteroffer.

### 4. This Court's decision in *Eikon* supports Freedman's, not Wings's, position.

Both parties cite to this Court's decision in *Eikon King Street Manager, L.L.C. v. LSF King Street Manager, LLC*, to support their respective arguments as to whether Freedman's election to purchase Wings's Membership Interest required

Freedman to make a "mirror image"[8] acceptance of Wings's $1,470,752.62 offer price. *See* 109 S.W.3d 762 (Tex. App.—Dallas 2003, pet. denied).

*Eikon* involved a buy-sell provision in a limited lability company agreement that required the invoking member's notice to set forth a "Stated Amount" representing the price at which the Invoking Member would be willing to purchase all the properties and other assets owned by the company. *Id.* at 764. The agreement then stated a formula whereby the Stated Amount was used to calculate the value of each member's interest in the company. *Id.* Similar to the present case, the offeree member could elect to buy or sell pursuant to the invoking member's price. *Id.* at 764–65.

The parties invoked the buy-sell provision, but, as in this case, fell into disputes about the calculated sale price. The offeree accepted the Stated Amount for all the assets but believed the offeror had miscalculated the price for the offeror's share. *Id*. at 765. The offeree tendered the full requested price but expressly reserved its right to the contested portion according to its calculations. *Id*.

The offeror sued the offeree, alleging that the offeree breached the agreement. *Id*. The offeree counterclaimed, seeking a declaratory judgment that required the offeror to sell its interest pursuant to the agreement. *Id.* Both parties filed summary-judgment motions, and the trial court granted the offeree's motion and denied the

---

[8] The parties and the *Eikon* opinion use the phrase "mirror image" to mean that the party receiving the offer would reflect back an unqualified acceptance of every term in the proposal.

–22–

offeror's motion. *Id.* at 766. On appeal, this Court observed that the agreement did not require "mirror image" acceptance language. *Id.* at 767. Instead, the key factor in determining the invoking member's offer was the "Stated Amount," and the value of each member's individual interest was then determined based on a prescribed calculation from that number. *Id.* We rejected the offeror's complaint that the offeree was not free to challenge the offeror's methodology or calculations and that the offeree could only ignore a defective notice or issue its own. *Id.* Among other reasons for our holding, we noted that the offeror did not challenge the basis of the offeree's calculations. *Id.* We also disagreed with the offeror's contention that the offeree ratified a "defective notice" by choosing to respond to it. *Id.* Instead of ratifying the notice, the offeree had limited its acceptance to the Stated Amount, not to the offeror's related calculations. *Id.*

As with the agreement at issue in *Eikon*, § 12.2 of the Freewings Agreement did not require Freedman, the offeree, to make a "mirror image" unqualified acceptance of Wings's entire proposal, including his $1,470,752.62 offer to sell. Instead, § 12.2 gave Freedman the option to buy Wings's Membership Interest "pursuant to the terms of the Offer." Like the offeree's acceptance of the "Stated Amount" but challenge to the calculated membership interest price in *Eikon*, Freedman's election to buy Wings's 65% Membership Interest at a price derived solely from Wings's $658,485.16 offer to buy Freedman's 35% Membership Interest complied with the contract.

Wings contends that *Eikon* is factually distinguishable from this case because the offeree in *Eikon* paid the invoking member's full offer price at closing, subject to the offeree's right to recover the contested portion. *See* 109 S.W.3d at 765. In contrast to the offeree member in *Eikon*, Freedman did not tender Wings's $1,470,752.62 offer price until *after* this suit was filed and after the trial court's summary-judgment orders required Freedman to tender that amount. Wings asserts that Freedman's tender was too late because the deadline under § 12.2 to respond to Wings's offer had already passed. We are not persuaded by Wings's arguments because, as explained previously, his proposed $1,470,752.62 price for the sale of his Membership Interest was not a "term of the Offer." Accordingly, Freedman's purported late tender of Wings's preferred sale price has no bearing on our analysis under the Agreement.

### 5. Question 2 Conclusion

For each of the above reasons, we hold that Freedman's December 30 response to Wings's offer strictly complied with "the terms of the Offer" under § 12.2 by electing to purchase Wings's 65% Membership Interest at a "per Membership unit or percentage of ownership offer price" that was the converse of Wings's "offer price" to buy Freedman's 35% Membership Interest.

### C. Question 3 - Freedman is Entitled to Buy Wings's Membership Interest for $1,222,901.01.

The legal effect of our determinations of the parties' Question 1 and Question 2 is that the trial court was correct in determining that Freedman was entitled to buy

Wings's membership interest, but the trial court was incorrect in ordering Freedman to do so at Wings's proposed sale price.

In conclusion, the "term of the Offer" under § 12.2 of the parties' Agreement was Wings's "offer to buy" Freedman's Membership Interest for an "offer price" of $658,485.16, or $18,813.86 for each Membership unit. Freedman did elect to buy Wings's Membership Interest "pursuant to the terms of the Offer," that is, pursuant to the "per Membership unit or percentage of ownership price" of that same $18,813.86 multiplied by Wings's 65% ownership interest. Freedman's calculated price of $1,222,901.01 resulted solely from Wings's $658,485.16 "offer price." Accordingly, the trial court erred insofar as it rendered judgment ordering a $1,470,752.62 price for the sale of Wings's Membership Interest to Freedman.

We overrule Wings's first issue. We sustain Freedman's first, second, and third cross issues.

## V.     The Trial Court Properly Awarded Attorney's Fees to Freedman.

The trial court's summary-judgment orders awarded attorney's fees to Freedman based on Chapter 38 of the Texas Civil Practice and Remedies Code (regarding his breach-of-contract counterclaim) and based on Chapter 37 of the Texas Civil Practice and Remedies Code (concerning his declaratory judgment counterclaim). As mentioned previously, the parties then stipulated the amount of Freedman's attorney's fees, subject to Wings's right to challenge Freedman's

entitlement to any such fees. The trial court then signed a final judgment that incorporated these fee awards.

Wings's second issue contends that he is the party entitled to attorney's fees, and thus the trial court erred in awarding attorney's fees to Freedman. He asks us to remand the issue of attorney's fees to the trial court to determine the appropriate amount of an award to Wings. Wings also asserts that Chapter 38 and Chapter 37 do not support such an award of attorney's fees to Freedman. Freedman's fourth issue, which we construe as a response to Wings's second issue, contends the attorney's fees statutes support the trial court's fee award to Freedman. To resolve these issues, we will consider these statutes.

## A. Standard of Review

We review a trial court's award of attorney's fees for an abuse of discretion. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). However, whether a party is entitled to attorney's fees or whether attorney's fees are available under a particular statute is a question of law for the court. *Sunchase IV Homeowner's Ass'n, Inc. v. Atkinson*, 643 S.W.3d 420, 422 (Tex. 2022); *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999) (per curiam).

## B. Chapter 38 Supports the Award of Attorney Fees to Freedman.

Chapter 38 of the Civil Practice & Remedies Code authorizes the recovery of attorney's fees "in addition to the amount of a valid claim and costs, if such claim is for . . . an oral or written contract." *See* TEX. CIV. PRAC. & REM. CODE ANN.

§ 38.001(b)(8). To recover fees under Chapter 38, "a litigant must do two things: (1) prevail on a breach of contract claim, and (2) recover damages." *MBM Fin. Corp. v. Woodlands Operating Co., L.P.*, 292 S.W.3d 660, 666 (Tex. 2009). The second requirement "is implied from the statute's language: for a fee recovery to be 'in *addition* to the amount of a valid claim,' the claimant must recover some amount on that claim." *Id.*

Wings contends that Freedman (i) is not a prevailing party under Chapter 38 and (ii) has not established breach of contract damages. For the reasons discussed previously, we conclude that Freedman prevailed on his breach of contract claim. On the question of damages, Freedman asserts that Chapter 38 permits an award of attorney's fees here based on the trial court's order that Wings must "specifically perform his duties and obligations in accordance with Section 12.2 of the Freewings Company Agreement."

In *MBM Financial*, the Supreme Court reversed a judgment that had awarded attorney's fees under Chapter 38 to a litigant who could not recover any damages regarding its breach-of-contract claim. *MBM Fin.*, 292 S.W.3d at 666 (holding that "the [appellee's] fee award cannot be affirmed based on Chapter 38" because "[the appellee] can recover neither actual nor nominal damages"). However, the question of whether an award of specific performance can support an award of attorney's fees under Chapter 38 was not before the Court.

–27–

As to this question, "[c]ourts have recognized that a 'valid claim' under [Chapter 38] is not limited to a claim for monetary damages, but also encompasses specific performance of the agreement to avoid actual damages." *Scott Pelley P.C. v. Wynne*, No. 05-15-01560-CV, 2017 WL 3699823, at \*14 (Tex. App.—Dallas Aug. 28. 2017, pet. denied) (mem. op.); *see also*:

- *Woody v. J. Black's, L.P.*, No. 07-12-00192-CV, 2013 WL 5744359, at \*6 (Tex. App.—Amarillo Oct. 18, 2013, pet. denied) (mem. op.) (recognizing that an "injunction enforcing specific performance of a contract is something of value" sufficient to support Chapter 38 attorney's fees);

- *Albataineh v. Eshtehardi*, No. 01-12-00671-CV, 2013 WL 1858864, at \*1–2 (Tex. App.—Houston [1st Dist.] May 2, 2013, no pet.) (mem. op.) (holding that "an award of specific performance of the parties' settlement and of the restrictive covenant in the special warranty deed" supported an award of Chapter 38 attorney's fees);

- *Rasmusson v. LBC PetroUnited, Inc.*, 124 S.W.3d 283, 287 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (holding that award of specific performance of arbitration agreement permitted recovery of Chapter 38 attorney's fees);

- *but see Boyaki v. John M. O'Quinn & Assocs.*, PLLC, No. 01-12-00984-CV, 2014 WL 4855021, at \*13–14 (Tex. App.—Houston [1st Dist.] Sept. 30, 2014, pet. denied) (mem. op.) (noting split of authority among Texas courts of appeal on this issue).

We agree with our sister courts who have concluded that specific performance of an agreement to avoid actual loss to the aggrieved party will support an award of attorney's fees under Chapter 38. *See Boyaki*, 2014 WL 4855021, at \*13–14 ("[A]n injunction to enforce specific performance under a contract is of pecuniary value if that enforcement prevents actual loss to the aggrieved party."); *cf. Franklin v.*

–28–

*Chatto*, No. 02-23-00265-CV, 2024 WL 4377498, at \*12 (Tex. App.—Fort Worth Oct. 3, 2024, no pet. h.) ("[T]o restrict the language of 'the amount of a valid claim' to only those situations where there is a specific award of damages unduly cabins the language used."). Accordingly, the trial court's order that Wings must "specifically perform his duties and obligations in accordance with Section 12.2" was sufficient to support the trial court's award of attorney's fees to Freedman.

**C.      Chapter 37 Supports the Award of Attorney Fees to Freedman.**

We turn next to whether Chapter 37 of the Civil Practice and Remedies Code, known as the Declaratory Judgment Act, independently supports the attorney's fee award to Freedman. In any proceeding under Chapter 37, "the [trial] court may award costs and reasonable and necessary attorney's fees as are equitable and just." CIV. PRAC. & REM. § 37.009. Wings contends that Chapter 37 does not support an award of attorney's fees to Freedman because, in Wings's view, Freedman is not the prevailing party. However, an award of attorney's fees under Chapter 37 does not depend on whether a party prevailed on his declaratory relief claim. *See LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 642 (Tex. App.—Dallas 2012, pet. denied) (recognizing that "[a] non-prevailing party may be awarded attorney's fees and costs" under Chapter 37).

Wings also asserts that Chapter 37 did not entitle Freedman to attorney's fees because Freedman's declaratory judgment claim merely duplicated the issues in his breach-of-contract claim. "[W]hen a claim for declaratory relief is merely tacked

–29–

onto a standard suit based on a matured breach of contract, allowing fees under Chapter 37 would frustrate the limits Chapter 38 imposes on such fee recoveries." *MBM*, 292 S.W.3d at 670. The declaratory judgment claim must do more "than merely duplicate the issues litigated" via the contract claims. *Etan Industries, Inc. v. Lehmann*, 359 S.W.3d 620, 624 (Tex. 2011) (citing *MBM*, 292 S.W.3d at 670). In this case, Freedman requested and obtained a judicial declaration that did not "merely duplicate" his breach-of-contract claim. For example, the order granting Freedman's motion for partial summary judgment on his declaratory judgment claim declared "that, from this point forward, Steven J. Freedman is entitled to act as the sole manager for Freewings." Accordingly, we conclude that Chapter 37 independently supports the attorney's fee award to Freedman in this case.

We overrule Wings's second issue.

## VI. Conclusion

We modify the trial court's second amended final judgment to reflect a $1,222,901.01 "Purchase Price" applicable to the sale of Wings's 65% Membership Interest in Freewings to Freedman. We affirm the second amended final judgment as modified.

/Emily Miskel/

EMILY A. MISKEL
230077f.p05 JUSTICE

–30–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

JADY WINGS, Appellant

No. 05-23-00077-CV      V.

STEVEN J. FREEDMAN AND
FREEDMAN METALS, INC. D/B/A
FMI RECYCLING, Appellees

On Appeal from the 44th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DC-21-01163.
Opinion delivered by Justice Miskel.
Justices Nowell and Kennedy
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

> We modify the trial court's second amended final judgment to reflect a $1,222,901.01 "Purchase Price" applicable to the sale of Jady Wings' 65% Membership Interest in Freewings Realty, LLC to Steven J. Freedman.

It is **ORDERED** that, as modified, the second amended final judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee STEVEN J. FREEDMAN AND FREEDMAN METALS, INC. D/B/A FMI RECYCLING recover their costs of this appeal from appellant JADY WINGS.

Judgment entered this 11th day of December, 2024.